UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE POLYMEDICA CORP.  :   Civil Action No. 00-12426 REK
SECURITIES LITIGATION   :   AND ALL RELATED CASES

## SUPPLEMENTAL AFFIDAVIT OF R. ALAN MILLER

R. Alan Miller, being duly sworn, deposes and says:

1. I am submitting this Supplemental Affidavit in support of the Lead Plaintiff's renewed motion for certification of a class action as to the disputed period January 1 to August 21, 2001.

2. I have previously submitted an Affidavit in this matter that sets forth my opinions as to market efficiency for PolyMedica stock and the bases therefore.  A copy of that affidavit (without exhibits) is attached as Exhibit 1 hereto.  An updated resume is attached as Exhibit 2 hereto.

3. In addition to the materials listed in the Affidavit as items I have reviewed, I have also reviewed the following:

- Surreply Memorandum In Support of Defendants PolyMedica Corporation and Liberty Medical Supply, Inc.'s Opposition to Lead Plaintiff's Motion for Class Certification;

- Supplemental Affidavit of Denise Neumann Martin; and

- The opinions of the Court of Appeals in the *PolyMedica* and *Xcelera.com* cases.

4.    Defendants contend that in the period of January 1 to August 21, 2001 (hereafter the "disputed period"), the market for PolyMedica stock was not efficient.  However, applying the *Cammer* factors to that period produces the following results:

A.    **Average Weekly Trading Volume.**   During the disputed period, the average weekly trading volume was 4,140,232 shares.  The number of shares outstanding during that period was approximately 13,280,000.  Two percent of the number of outstanding shares is 265,600.  Clearly the average weekly trading volume during the disputed period greatly exceeded this *Cammer* benchmark.  This demonstrates that PolyMedica shares were very actively traded during this period, which implies "significant investor interest" and a likelihood that market participants are executing trades on the basis of new information.  *See Xcelera.com,* 430 F. 3d 503, 514.

B.    **Number of Market Makers.**   There were 193 market makers facilitating a market in PolyMedica stock during the disputed period as identified by the Bloomberg system.  Although many of these accounted for small numbers of shares, 27 market makers traded over a million shares each and all of the major firms participated.  This compares favorably with the "more than twenty market-makers for Xcelera stock".  430  F.3d at 515.  The presence of so many market makers indicates that there was an infrastructure to facilitate or accommodate active trading in PolyMedica stock.

C.    **Number of Securities Analysts.**   During the disputed period, at least seven brokerage firm analysts followed the stock.  This is many more than the one analyst that reported on Xcelera stock.  430 F.3d at 514-5.

D.    **The Filing of SEC Reports and Availability of News.**   PolyMedica regularly filed SEC reports during the disputed period.  There were 348 articles mentioning

2

PolyMedica from all sources; 183 were from major sources. This is more than one major source article for each business day during the disputed period on average. The existence of so many news items establishes that information about PolyMedica was available to market participants, and the abundance of news articles is in my opinion related to the high volume of trading.

      E.    **PolyMedica's Market Capitalization.** The market capitalization during the disputed period was as follows (see paragraph 22 of Affidavit):

| Date | Market Capitalization |
|------|-----------------------|
| 2/13/01 | $490,381,991.44 |
| 6/21/01 | $523,952,669.76 |
| 8/13/01 | $215,479,504.66 |

      F.    **Availability of S-3 Filing.** PolyMedica was eligible to use Form S-3 throughout the disputed period.

      G.    **Empirical Facts Demonstrating That PolyMedica's Stock Price Responded to News.** Exhibit I of my original Affidavit shows that the ten largest stock price movements in the Class Period were in reaction to news concerning PolyMedica; five of the largest ten price movements occurred in the disputed period. In my opinion, this is the most important empirical evidence that information reaching the marketplace became reflected in the price of PolyMedica shares.

      6.    We have also examined whether PolyMedica's stock reflected general market and industry influences. Although not a significant factor in determining market efficiency, we included it for completeness. From an examination of the movement of PolyMedica's stock prices, the NASDAQ Composite Index and an index of the comparable companies shown in PolyMedica's proxy statement, one can see that in terms of direction, trends, and general

magnitude, PolyMedica moves similarly to the other data examined.  Of course, PolyMedica's stock price is somewhat more volatile than the indexes, as any one stock almost always is. And although the comparable companies were those presented in PolyMedica's Proxy Statement, they are not all actually in identical lines of business as PolyMedica.  This comparison also shows that the dramatic price increases and declines in the price of PolyMedica stock during the disputed period in response to new company-specific information were not mirrored in price movements of the NASDAQ Composite Index or the comparable company index.  See Exhibit 3 hereto.

Defendants' Approach

7.    Defendants repeat their claim that since they can now determine retrospectively that there was, during a portion of the Class Period, a) positive serial autocorrelation and b) put/call parity imbalances creating a possibility for arbitrage profit,  the market for PolyMedica stock was therefore not efficient.  As explained in my Affidavit, these are not meaningful factors.

8.    Defendants' expert states that she performed a statistical technique known as regression analysis on PolyMedica's stock prices during the class period and that this statistical analysis shows the existence of positive serial autocorrelation in the stock price during a portion of the class period.  Any such correlation, however, is not discernible until after it occurs.  A person trading PolyMedica stock could not contemporaneously know that the direction of the stock price on any given day allows a prediction of the next day's price movement.   It is only after the fact that positive serial autocorrelation can be determined to have existed.  Moreover, if a trader could determine that such positive serial autocorrelation had existed during some previous period of time, the trader could not know that this condition

4

would exist during any particular future time.  Defendants' expert states that this

autocorrelation phenomenon existed during only a portion of the class period; in other words,

it did not exist during other portions of the class period.  Although the text of her report does

not disclose in what portion of the class period it existed (see Martin Affidavit, par. 31),

exhibit 2 to her report states that positive serial correlation existed during the period April 1,

2001 to August 20, 2001.  By her own admission, then, this test indicates that the market for

PolyMedica stock was efficient during a portion of the disputed period, namely January 1 to

March 31.  Furthermore, a trend in stock price during a period of significantly negative

compound (and heavily contradicted) news, such as existed with PolyMedica during 2001, is

hardly surprising nor necessarily unrelated to news about PolyMedica affecting its stock price.

9.     Also as explained in my Affidavit, the apparent existence of put/call parity

imbalances as alleged in Dr. Martin's affidavit is often caused by supply and demand for the

stock and various options, and by overall information concerning PolyMedica causing

divergent views as to its prospects among investors and not by reaction to new information.

Hindsight determination that such imbalances may have existed at some point in the past is no

substitute for the (then) contemporaneous analysis of traders themselves who may well not

have perceived the risk factors and consequent pricing implications for the options the same as

an analyst today might, and who may well have elected not to trade for other reasons including

fundamental analysis.

That is, there was highly contradictory information in the market for PolyMedica stock

during the disputed period in 2001, such that there was a very high level of short selling of the

stock, while the company provided informational support for holders and buyers.  This

situation can create a high demand for puts from those who wanted to profit from a price

decline with less risk than shorting the stock, as well as from those investors who want to protect gains without selling the stock they hold. Such higher-than-normal demand can cause the premia to rise, but not because of any specific news item. Options prices also reflect numerous other factors including, for example, concerns about liquidity of the options, ability to close out the positions when desired, greater than normal volatility of the underlying stock, and the relative cost of alternatives. Transaction costs would prevent many traders from entering into Ms. Neumann's hypothetical trade, as there are commissions to be paid on both opening options transactions and costs of the short sale, then more costs to unwind the transaction, which costs could easily consume the apparent hindsight "spread" or "imbalance". None of these factors in creating the apparent "imbalance" are caused by reactions to news, and Ms. Neumann has not demonstrated that they were. Finally, there are numerous anomalies within the Prophet data relied upon by Dr. Martin which suggests a high likelihood that (at least some of) the data is erroneous, such as for example, closing prices outside the range of the open-high-low data for the day. See Exhibit 4. Again, none of these apparent hindsight "imbalances" caused profit opportunities for traders based on new information to the market, and none are the consequence of an informationally inefficient market.

10.    Clearly the market for PolyMedica stock was efficient during the Class Period. Defendants' submissions have not caused me to change that opinion.

Signed under the pains and penalties of perjury this 21ˢᵗ day of February 2006.

_R. alen Mill_____
R. Alan Miller

**Certificate of Service**

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") and paper copies will be sent to those indicated as nonregistered participants on the 23rd day of February, 2006.

/s/Thomas G. Shapiro
Thomas G. Shapiro

7