<u>**EXHIBIT 1**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

IN RE POLYMEDICA CORP.        :     Civil Action No. 00-12426 REK
SECURITIES LITIGATION         :     AND ALL RELATED ACTIONS

<u>AFFIDAVIT OF R. ALAN MILLER</u>

COMMONWEALTH OF PENNSYLVANIA    )
                              )  SS:
COUNTY OF DELAWARE              )

R. Alan Miller, being duly sworn, deposes and says:

1.     I am submitting this Affidavit in Support of the Lead Plaintiff's Motion for Class Certification.

2.     I am President of Philadelphia Investment Banking Company ("PIBC"). A copy of my resume is attached as Exhibit A hereto, which outlines my professional experience and expertise. Included in Exhibit A is a list of the thirty cases in which I have testified in court. I have been qualified or accepted as an expert on the operations and efficiency of the securities markets, damages, materiality issues, investment banking practices, valuations and related corporate finance matters in numerous federal and state courts nationwide beginning in 1977. I have provided many more depositions and submitted numerous Declarations and Affidavits on matters in these areas, including many dealing with market efficiency questions or the factors relevant to such studies.

3.     PIBC provides a wide range of corporate finance services to clients. These services include raising capital through private placements of debt and equity financings;

financial analysis and advisory services re: public offerings of securities; merger, acquisition and divestiture services; evaluation and economic analysis services; consulting and litigation support; and other financial services.

4.      PIBC and its principals perform a considerable amount of work in the areas of evaluation of businesses and securities and the factors involved in such evaluation.  These are done on a formal basis for a variety of purposes, as well as continuously on an informal basis in the process of performing our corporate finance functions such as raising capital, assisting in mergers and acquisitions, etc.  The factors used in such evaluations and their importance and materiality to the investment community are areas in which I have developed expertise and had substantial experience over the last thirty-one years.  Additionally, we have prepared a substantial number of analyses of market impact and damages in connection with numerous shareholder litigations.

5.      I have been asked by counsel for Plaintiff to examine the efficiency of the market for PolyMedica Corporation ("PolyMedica" or the "Company") common stock during the Class Period at issue and to review and comment on Defendants PolyMedica Corporation and Liberty Medical Supply Inc.'s Opposition To Lead Plaintiff's Motion For Class Certification ("Defendants' Brief") and the Affidavit Of Denise Neumann Martin ("Affidavit") filed by Defendants in Opposition to Class Certification.

6.      The following is among the information I have reviewed to date:

- The Consolidated Complaint

- Lead Plaintiff's Motion For Class Certification

- Defendants' Opposition To Plaintiff's Motion For Class Certification

- The Affidavit Of Denise Neumann Martin

- The Affidavit Of Denise Neumann Martin in Complete Management, Inc.

- PolyMedica's Reports on Forms 10-K and 10-Q for 1997 through 2002 and EDGAR list

- Commonly available databases for stock price and volume information

- Lists of brokerage industry analyst reports on PolyMedica

- List of news reports and press releases on PolyMedica

- List of internet information sources

7.      In evaluating market efficiency for PolyMedica stock, I considered the following factors, which are discussed in *Cammer v. Bloom,* 711 F.Supp. 1264 (D.N.J. 1989) ("*Cammer*"), and are used by the courts to assess whether information is flowing to market participants in a way that permits them to incorporate such information into their decisions to buy, sell or hold a security:  1) average weekly trading volume; 2) number of analysts who follow the stock; 3) number of market makers or arbitrageurs; 4) the company's eligibility to file an S-3 Registration Statement; and 5) the stock price's reaction to unanticipated news.

In *Cammer*, the Court noted:

> the central question under the fraud on the market theory is whether the stock price, at the time a plaintiff effected a trade, reflected the "misinformation" alleged to have been disseminated.
> p. 1282

At p. 1287 of the Opinion, the Court again noted how one of the most important characteristics of an efficient market is that it responds to important news about the Company:

> Finally, it would be helpful to a plaintiff seeking to allege an efficient market to allege empirical facts showing a cause and effect relationship between unexpected corporate events or

> financial releases and an immediate response in the stock price.
> This, after all, is the essence of an efficient market and the
> foundation for the fraud on the market theory.

8.      Based on the *Cammer* factors, which I will analyze individually, as well as my

background, experience and expertise as described herein and factors affecting information

dissemination to the markets since *Cammer* was decided, it is my opinion that, during the Class

Period at issue, PolyMedica common stock traded in an efficient market.

9.      Before reviewing the specific factors, however, several general comments are

appropriate.  The term "Market Efficiency", as it arises in the class certification stage of

securities fraud litigation, is used to describe whether the market for a particular security is

informationally efficient.  The relevant inquiry has therefore focused on whether a market

mechanism exists to allow trading to occur if participants so wish, and on whether information

is available to these participants on which they could base an investment decision—hence the

development of the Cammer v. Bloom factors as an outline for such an examination.  The

context of the examination is important in defining the factors to examine.  The central

question is whether stocks trade on, and their prices are set based on, information about the

issuer and whether misinformation could therefore affect the level of prices.  For purposes of

this discussion, I will call this concept Informational Market Efficiency.

The Efficient Market Hypothesis was put forth decades ago in the academic world to

attempt to explain how various types of information are reflected in stock prices.  There are

three versions.

- The weak form suggests that a current stock price is the result of past stock prices.

- The semi-strong form suggests that all currently public information available to market participants is reflected in stock prices.

- The strong version suggests that in addition to known information, private information or any information that might be knowable is incorporated into stock pricing.

Most market practitioners and academics believe that the semi-strong version is operative today (and during the Class Period)—that the market price of a stock reflects all information known to market participants.

10.     Further, stock prices are determined by supply of and demand for a stock. At any point in time, if there are more buyers than sellers, the buyers will bid the price up to get the (relatively scarcer) seller's shares. Conversely, if there are more sellers than buyers at any time, they will push the price down until enough buyers are found. The U.S. stock markets generally function smoothly and with adequate liquidity to facilitate those who want to buy and sell, although at times of important news, it can take more time than normal to locate enough counterparties to complete desired transactions. This does not connote inefficiency—just that it might take slightly longer to reach price equilibrium.

11.     A more theoretical or academic approach to the term "Market Efficiency" exists as well, which attempts to examine whether a particular securities price is "correct" at a point in time, or perhaps in equilibrium among buyers and sellers such that technical arbitrage opportunities (no matter how small) do not exist. This should not be confused with the informational efficiency definition above. For purposes of this discussion I will call this concept Equilibrium Market Efficiency.

Note that although each stock trade represents a point of equilibrium between a buyer and a seller, and a stable price level represents a consensus of such equilibria, they do not represent <u>agreement</u> between buyer and seller as to value; that is, a buyer will think the stock is going up and a seller will generally not think so at their agreed price. So they can agree on the price but not the outlook.

12.     Defendants' Brief says that Plaintiffs have not presented evidence of market efficiency. The most widely accepted factors to examine market efficiency are set forth in Cammer v. Bloom and are examined below.

13.     Defendants bypass a Cammer examination and the topic of Informational Market Efficiency and move into the area of Equilibrium Market Efficiency to claim that the market for PolyMedica stock during the Class Period was inefficient. This opinion is based on the presence of "arbitrage opportunities" in the stock at times during the Class Period, violations of "put call parity" and supply constraints on short sales. But by ignoring the appropriate and easily understood Cammer factors, and choosing an unnecessary and irrelevant level of abstraction, they obfuscate an overwhelmingly obvious conclusion that PolyMedica traded in an efficient market. In fact, I believe the data and information presented by Ms. Martin demonstrates that the market for PolyMedica stock was efficient, as I discuss below. For example, as *Cammer* discussed at p. 1292, Bromberg & Lowenfels, 4 Securities Fraud and Commodities Fraud (August 1988), suggests, at least for class certification, a presumption that *all* NYSE, AMEX and NASDAQ National Market System ("NMS") stocks trade on efficient markets—and this is before considering the vast improvements in information availability since that text was written in 1988.

14.     Second, although the proper focus in an examination of market efficiency is the particular stock in question, factors describing the general market in which a stock trades can also be relevant.  Here, PolyMedica traded on NASDAQ NMS which is widely considered an efficient marketplace in the investment community.  Included in Exhibit B hereto are informational materials on the NASDAQ Stock Market which highlight the many reasons for concluding it is efficient as a marketplace.

15.     Third, since *Cammer v. Bloom* was decided in 1989, markets such as the NASDAQ NMS, in which PolyMedica traded, have generally become even more efficient. Information has been increasingly disseminated electronically and much of it is available for retrieval at an investor's convenience.  SEC documents, which used to (at the time of *Cammer*, I believe) have to be retrieved physically in Washington, DC or through a very expensive private copying service have become available, and were available during the Class Period, over computer screens at no charge.  Other news sources, press and wire releases, and brokerage analyst reports are electronically archived and retrievable.  Trading information— quotes, trades, historical price and volume data, bids, asks, market makers—all are available on-line.  Local newspapers or financial hard-copy publications are no longer the only source of information and trading data.  Information is available to market participants, including investors, much more directly than previously, so the intermediary information distribution mechanism of analysts and brokerage firm involvement is not nearly as necessary as it once was to ensure dissemination of information.

16.     Fourth, in my opinion, Ms. Martin chose the methodology she used to analyze the efficiency of PolyMedica's market in order to ignore or obfuscate the fact that the market

for PolyMedica stock was clearly efficient according to the *Cammer* factors.  I base this

opinion on the fact that Ms. Martin herself has submitted an Affidavit in another case using the

*Cammer* factors to reach her opinions.  See Exhibit J.

### The *Cammer* Factors

17.    As discussed above, the only question which is relevant at this stage is the

informational efficiency of the market—whether it responded to news and incorporated it into

the stock's price, not whether the market produced the "right" price different from the timely

consensus views of buyers and sellers.  See Exhibit A-2, Professor Malkiel's article that "Are

Markets Efficient? – Yes, Even If They Make Errors" (The Wall Street Journal, December 28,

2000).  The *Cammer* factors have been the test used by many courts to assess market

efficiency.  These factors are the following.

18.    Average Weekly Trading Volume

Average weekly trading volume is the total trading volume for the period being studied

divided by the number of weeks in the period.

PolyMedica experienced substantial weekly trading volume during the Class Period as

shown in Exhibit C.

At p. 1293, *Cammer* states:

> Turnover measured by average weekly trading of two percent or
> more of the outstanding shares would justify a strong presumption
> that the market for the security is an efficient one; one percent
> would justify a substantial presumption

and explains that this factor is important as it demonstrates investor interest in the stock.

PolyMedica had between 8,913,476 and 13,284,804 shares outstanding during the Class

Period.  Using the midpoint of this range, two percent of 11,100,000 = 222,000 shares.  At

1,895,324 average weekly shares traded, there can be no question that PolyMedica vastly

exceeded this *Cammer* benchmark.  Ms. Martin ignores the *Cammer* guideline on trading

volume.

19.   Number of Market Makers

a.   *Cammer*, at p. 1286-87, says on this point:

The existence of market makers and arbitrageurs would ensure
completion of the market mechanism; these individuals would
react swiftly to company news and reported financial results by
buying or selling stock and driving it to a changed price level.

b.   During the Class Period, PolyMedica had at least 283 market makers

participating in the market for its common stock as identified by the Bloomberg system.

Although many of these accounted for small numbers of shares, 30 market makers traded over

a million shares each and all of the major firms participated.  This is certainly sufficient to

provide an interested group of market participants ready to commit capital upon investors'

receipt of information affecting their investment opinions.  See Exhibit D.

c.   What is important to market efficiency is that the mechanism is in place

to facilitate trading when those who wish to trade receive information.  Here, there is huge

capacity for trading from some of the largest, most active NASDAQ market-making firms.

d.   Ms. Martin ignores this factor.

20.   Number of Securities Analysts

a.   Investext lists 104 analyst reports from 14 analysts during the Class

Period; Multexnet lists 83 documents from 8 analysts including 51 research documents and 32

"morning notes". (Some of these may overlap.) See Exhibit E. This is more than adequate

coverage to contribute to market efficiency, even without considering the substantial

improvements in information dissemination since *Cammer* discussed above.

    b.  Ms. Martin ignores this factor.

  21.  The Filing of SEC Reports And Availability of News

    a.  PolyMedica regularly filed reports with the Securities and Exchange

Commission ("SEC"). See Exhibit F (EDGAR list). While the filing of SEC reports is in

itself not dispositive in determining market efficiency, as the extensive discussion in *Cammer*

shows, factors such as this are a valid and important component of the provision of information

to the marketplace and when coupled with the other structural factors identified by *Cammer*

(market makers, trading volume, etc.) are exactly the elements that need to be present to have

an efficient market.

    b.  Articles and Press Releases. For the Class Period, the Factiva.com news

retrieval service (a service of Dow Jones & Reuters) lists 851 articles mentioning PolyMedica.

The Factiva.com news retrieval service shows 398 articles from "major" sources only and 851

for "all" sources (which will overlap somewhat with EDGAR) for the Class Period. In

addition there were 22,222 chat room postings on the Yahoo bulletin board alone, and at least

eight other "chat rooms" showed activity at some level. Although not company releases or

news articles, the presence of chat room postings indicates investor interest in the stock.

Clearly there was no lack of information provided to the marketplace regarding PolyMedica.

See Exhibit G.

c.    Ms. Martin ignores the availability of information regarding PolyMedica as a factor.

22.    Market Capitalization

a.    *Cammer* supports examination of a company's market capitalization as one of the factors which may demonstrate efficiency.  The market capitalization for PolyMedica was as follows at times shown during the Class Period:

| Date | Market Capitalization |
|---|---|
| 7/17/98 | $84,678,022.00 |
| 10/23/98 | $88,382,543.63 |
| 1/22/99 | $79,280,722.50 |
| 6/24/99 | $86,791,689.81 |
| 8/10/99 | $163,150,638.00 |
| 11/11/99 | $283,052,393.75 |
| 2/9/00 | $443,180,487.75 |
| 6/27/00 | $688,079,036.25 |
| 8/10/00 | $510,169,547.81 |
| 11/13/00 | $686,766,694.50 |
| 2/13/01 | $490,381,991.44 |
| 6/21/01 | $523,952,669.76 |
| 8/13/01 | $215,479,504.66 |
| 11/13/01 | $248,160,120.04 |

This level of market capitalization supports a finding of market efficiency.

b.    Ms. Martin ignores this factor.

23.    Availability of S-3 Filing

a.    This factor relates primarily to size of capitalization of a company and technical factors regarding previous filings.  As *Cammer* stated at p. 1285: "the existence of Form S-3 status is an important factor weighing in favor of a finding that a market is efficient."  Pursuant to Form S-3, companies which are registered under Section 12(g) of the

Exchange Act (among other specified sections) may use this form if the company has timely filed its reports with the SEC for the last twelve months and if it has an aggregate value of outstanding securities, not in the hands of affiliates, which totals greater than $75 million. It appears that PolyMedica qualified for this type of registration during the Class Period.

      b.     Ms. Martin does not discuss this factor.

24.   <u>Empirical Facts Demonstrating That PolyMedica's Stock Price Responded to News</u>

      a.     We reviewed publicly available databases to determine whether information was regularly provided to the market regarding PolyMedica, the nature of that information, whether that information appeared to be incorporated into the market price and whether the market reacted to apparently unexpected news. We considered PolyMedica's reports filed with the SEC (Exhibit F), its press releases to the investment community issued during the Class Period (Exhibit G), the analyst reports discussed heretofore (Exhibit E), and other news stories about the Company (Exhibit G).

      b.     Attached as Exhibit H are price and volume charts with markings showing times when we were able to discover information being provided to the market. This presents the minimum number of such pieces of information, as we do not include on it a) the electronic message (Internet) traffic which was heavy here or b) oral communications between management, brokers, customers, and others. Nonetheless, there are many hundreds of pieces of information <u>known</u> to have been available to the market in and around the time of the Class Period.

c.     Exhibit I presents the information in tabular form and identifies each piece of such known information.   A review of such information alongside the price and volume data shows the expected results.   Some examples are presented here for illustration.

| Event Date | Reported Volume | Closing Price | % Price Change | News Event |
|---|---|---|---|---|
| 3/26/99 | 1,524,500 | $8.59 | 40.29% | PolyMedica Corp. rose 2 15/32, or 40%, to 8 19/32. The medical supplies company was mentioned as a possible acquisition target in Business Week's "Inside Wall Street" column. |
| 8/2/99 | 1,178,100 | $19.38 | 16.54% | PolyMedica corp. rose 2¾, or 17%, to 19 3/8.  The medical supplies company was rated "buy" in new coverage by analyst Walter Ramsley at Fechtor, Detwiler & Co., Inc.  He said shares should reach 20 in 12 months. |
| 10/23/00 | 1,546,000 | $55.75 | 15.24% | PolyMedica Corp. reported third quarter net income of more than double a year ago's results, sending its stock up $7 3/8, more than 15%, to $55-3/4. |
| 11/20/00 | 3,542,200 | $25.75 | -49.68% | PolyMedica Corp., the largest provider of diabetes-testing kits, said it's unaware of a federal investigation into possible health-care fraud, as reported in Barron's while its shares plunged.  Shares of Woburn, Massachusetts-based PolyMedica lost half their value, falling $25.42 to $25.75, after the magazine reported the company was the subject of a probe, citing an unidentified senior FBI official. |
| 11/21/00 | 2,639,500 | $30.25 | 17.48% | PolyMedica Corp. said on Tuesday that it was continuing to buy back stock, which regained some of its losses in morning activity after a report the firm was the subject of an FBI investigation sent its shares reeling Monday...The stock rose nearly 14%, or $3-1/2, to $29-1/4 on the Nasdaq, making it one of the biggest percentage gainers on the day. |

As Yogi Berra (supposedly) said, "You can observe a lot just by watchin'."

d.     Ms. Martin does not discuss this factor.

25.     The appropriate determination of market efficiency here relates only to the question of whether information affects a stock's price and whether a market mechanism exists

to trade the securities reasonably promptly in response to the information.  Clearly, both

conditions are met in the PolyMedica Class Period.  The stock traded in an efficient market.

Defendants' Approach

26.     The contention that arbitrage opportunities existed in PolyMedica stock during

the Class Period is based on Defendants' claim of positive serial autocorrelation, specifically

that "the stock exhibited strongly significant positive one day serial correlation for portions of

the class period in 2001" (Brief page 11).  The belief that non-random daily price movements

are inconsistent with an efficient market invokes the academic, technical Efficient Market

Hypothesis which suggests that since prices reflect all known information, news will arrive

randomly and stock prices will therefore move randomly in an efficient market.  This theory

was articulated by Burton G. Malkiel in his book A Random Walk Down Wall Street in 1973

(W. W. Norton & Co., NY) and updated in 1975, 1981, 1985, 1990, 1996 and 1999.  Mr.

Malkiel is an economics professor at Princeton University.

27.     In 1999, Princeton University Press published A Non-Random Walk Down Wall

Street by Andrew W. Lo (a Professor of Finance at Massachusetts Institute of Technology) and

A. Craig MacKinlay (a Professor of Finance at the Wharton School, University of

Pennsylvania).  From the book jacket:

> For over half a century financial experts have regarded the
> movements of markets as a random walk—unpredictable
> meanderings akin to a drunkard's unsteady gait—and this
> hypothesis has become a cornerstone of modern financial
> economics and many investment strategies.  Here Andrew W. Lo
> and A. Craig MacKinlay put the Random Walk Hypothesis to the
> test.  In this volume, which elegantly integrates their most
> important articles, Lo and MacKinlay find that markets are not
> completely random after all, and that predictable components do

exist in recent stock and bond returns.  Their book provides a
state-of-the-art account of the techniques for detecting
predictabilities and evaluating their statistical and economic
significance, and offers a tantalizing glimpse into the financial
technologies of the future.

The articles track the exciting course of Lo and MacKinlay's
research on the predictability of stock prices from their early
work on rejecting random walks in short-horizon returns to their
analysis of long-term memory in stock market prices.  A
particular highlight is their now-famous inquiry into the pitfalls of
"data-snooping biases" that have arisen from the widespread use
of the same historical databases for discovering anomalies and
developing seemingly profitable investment strategies.  This book
invites scholars to reconsider the Random Walk Hypothesis, and,
by carefully documenting the presence of predictable components
in the stock market, also directs investment professionals toward
superior long-term investment returns through disciplined active
investment management.

28.   On page 243 of the current (1999) version of Malkiel's A Random Walk Down

Wall Street, Professor Malkiel acknowledges Lo and MacKinlay's work:

A "random walk" would characterize a price series where all
subsequent price changes represent random departures from
previous prices.  More formally, the random-walk model states
that investment returns are serially independent, and that their
probability distributions are constant through time.  As was noted
in Chapter Six, the earliest empirical work on the random-walk
hypothesis generally found that stock price changes from time to
time were essentially independent of (or unrelated to) each other.
Although some of these studies found that there was some slight
correlation between successive price changes, researchers
concluded that profitable investment strategies could not be
formulated on the basis of the extremely small dependencies
found.

More recent work, however, indicated that the random-walk
model does not strictly hold.  As will be noted below, some
consistent patterns of correlations, inconsistent with the model,
have been uncovered.  Nevertheless, it is less clear that violations
exist of the weak form of the efficient-market hypothesis, which

states only that unexploited trading opportunities should not persist in any efficient market.

**1.  Stocks do sometimes get on one-way streets.**  Several studies completed during the 1980s have been inconsistent with the pure random-walk model.  They show that there is some degree of momentum in the stock market and that price changes measured over short periods of time do tend to persist.  For example, researchers Andrew Lo and A. Craig MacKinlay found that for the two decades ending in the mid-1980s, broad portfolio stock returns for weekly and monthly holding periods showed positive serial correlation.  In other words, a positive return in one week is more likely than not to be followed by a positive return in the next week.

So the basis of Defendants' position—that the efficient market hypothesis <u>requires</u> a "random walk" type of market—is simply wrong and out of date.  For a well written summary discussion of this topic, see Exhibit A-1 hereto, which concludes "Market opportunities need not be market inefficiencies".

Other practical, real world factors that can contribute to positive serial autocorrelation without connoting inefficiency include:

a)      For example, not all investors get news at the same time.  Some cannot be reached by their broker instantly, some others may not decide instantly to transact.

b)      Extremely important news may result in very large numbers of buy (or sell) orders, which, to execute must be matched with sell (or buy) orders.  If the news implies a price direction—i.e., very good news would prompt many more buy orders than sell orders— it may take some time to absorb the quantity (that is, to locate enough sellers) of such orders.

c)      The quality of any particular analysis of market reactivity will depend on the ability to now identify the "news" which was then made available to market participants in

16

all the possible forms of transmission.  This process can be complex and the results incomplete.

29.    Defendants' second claim is that violations of "put-call parity" provide evidence of inefficiency.  Again this use of the term "efficiency" has no relation to informational efficiency, but is invoked to describe a condition where a technical arbitrage opportunity may appear in hindsight to have existed in a theoretical analysis, when a) such condition may not have appeared to be the same contemporaneously and certainly not uniformly so to all traders and b) the effect on pricing was vastly overshadowed by the effect of information on the market.  More specifically, Defendants claim that if one can purchase (or sell) puts, calls and stock of a company in such combination to produce a profitable arbitrage opportunity, that stock is not trading efficiently.  However, such an assessment is generated by hindsight use of data snapshots which may well not have characterized the dynamic nature of options and stock pricing at each point throughout the days in question.

- Such an assessment appears to ignore transaction costs which may well make arbitrage opportunities unattractive.

- Risk perceptions are an integral part of individual trader evaluations of the components of these arbitrage opportunities; if a trader's assessment of the risk of the securities or questions about the ability to exit the trades cause his return requirement to exceed the rate assumed in the pricing scenario, he may not have seen the profit potential Defendants now do.

- Liquidity concerns, particularly in cases of imbalance of supply and demand for the securities can cause substantial reluctance to engage in superficially attractive arbitrage opportunities for fear of getting stuck in positions.

30.    Third, Defendants incorrectly argue that there were supply constraints on short sales, providing "indirect evidence" that the market for PolyMedica stock was inefficient.

A.    This has no relationship to informational efficiency.

B.    Defendants point out that about <u>66%</u> of PolyMedica's outstanding shares were shorted in 2001, vs. about 2% for the average NASDAQ stock. This figure appears to reach about <u>80%</u> of the float shares. How can one claim such a marketplace is inefficient if it can accommodate that level of short interest and continue to function normally? This factor is not an indication of <u>inefficiency</u>; it confirms the very substantial efficiency of the system and the market.

31.    Defendants mention the "persistence of that condition"—unfilled short demand and high costs of shorting—while ignoring the cause of that condition—that significant negative information was circulating about the Company while being denied or unresolved.

32.    Next, Defendants raise the issue of "artificial" shares created by short-selling (those shares lent by holders to allow the short sale) causing difficulties in identifying class members, managing the class, inflating the number of damaged shares and inflating the damages. These are straw men.

All purchasers are long the stock until they sell. If, as Defendants say, the lenders of shares do not know their broker is lending their shares, it does not make them any less a class member. Likewise for the purchaser of the shorted shares who did not know they were shorted. Neither the lender nor the purchaser of shorted shares should be eliminated as a class member.

In fact, nearly all stocks have some short interest, so if Defendants' arguments are correct, virtually no stock would be immune from the challenge on the "artificial shares" issue.

33.   The following Exhibits are attached hereto:

| | |
|---|---|
| Exhibit A | Resume of R. Alan Miller |
| Exhibit A-1 | Excerpt from book "A Non-Random Walk Down Wall Street" |
| Exhibit A-2 | Professor Malkiel's Article: "Are Markets Efficient? – Yes, Even If They Make Errors" |
| Exhibit B | NASDAQ Stock Market Materials |
| Exhibit C | Weekly Trading Volume Data |
| Exhibit D | Market Makers |
| Exhibit E | Securities Analysts' Reports |
| Exhibit F | EDGAR List |
| Exhibit G | Articles and Press Releases |
| Exhibit H | Price and Volume Chart Marked With Information Provided To Market |
| Exhibit I | Summary of PolyMedica's Top Ten Volume Spikes/ Price Movements |
| Exhibit J | Affidavit Of Denise Neumann Martin In Opposition To Plaintiffs' Motion For Class Certification In The Complete Management, Inc. Securities Litigation |

_____
R. Alan Miller

Subscribed and sworn to
before me this 12th day
of April, 2004.

_____
Notary Public

NOTARIAL SEAL
ELIZABETH M. GRIFFITHS, Notary Public
Radnor Twp., Delaware County
My Commission Expires November 5, 2005

19